UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

WAL-MART STORES, INC.,    )
    Plaintiff,     )
            )
 vs.        )   1:07-cv-0470-LJM-JMS
            )
S.C. NESTEL, INC. and OHIO FARMERS )
INSURANCE COMPANY,   )
    Defendants.   )

**MEMORANDUM OPINION & ORDER**

   This matter comes before the Court for a decision on the merits after a four-day

Bench Trial.  In March 2005, Plaintiff, Wal-Mart Stores, Inc. ("Wal-Mart"), and defendant,

S.C. Nestel, Inc. ("S.C. Nestel"), entered into a contract for S.C. Nestel to build a Wal-Mart

store in Washington, Indiana.  Pursuant to the terms of the contract, S.C. Nestel submitted

Performance Bond #754170 and Payment Bond #754170, which were executed by S.C.

Nestel as principal and defendant, Ohio Farmers Insurance Company ("Ohio Farmers"),

as surety.  Under the contract, S.C. Nestel's representative were required to perform daily

inspections of the job site and complete inspection reports.  Once every two weeks, a

compliance officer was required to perform an inspection and an inspection report.  On

September 12, 2005, Charles Nestel ("Nestel"), acting in his role as compliance officer,

signed a daily inspection report without having actually visited the job site.  Wal-Mart found

that this submission was "false or misleading" and terminated the contract.

   Wal-Mart initiated this action asserting claims under Indiana law for breach of

contract against S.C. Nestel and failure to defend and indemnify against Ohio Farmers.

In response, S.C. Nestel asserted counterclaims against Wal-Mart under Indiana law for

breach of contract, breach of duty of good faith and fair dealing, wrongful termination, and unjust enrichment. The parties subsequently stipulated to the dismissal of two of S.C. Nestel's counterclaims. Dkt. Nos. 52, 54, 59, 61. The parties filed cross motions for summary judgment on all of the remaining claims and counterclaims.

On March 30, 2009, the Court issued its ruling on the parties' cross motions for summary judgment. Dkt. No. 66. The Court granted Wal-Mart's motion for summary judgment on S.C. Nestel's counterclaims for wrongful termination and breach of duty of good faith and fair dealing, but denied Wal-Mart's motion for summary judgment on S.C. Nestel's claim for unjust enrichment. *Id.* at 19-23. The Court denied the parties' cross motions for summary judgment on Wal-Mart's claim for breach of contract and S.C. Nestel's remaining counterclaim for breach of contract because the Court concluded that the contract provision pursuant to which Wal-Mart terminated the contract required S.C. Nestel to have intentionally submitted a false and misleading report. The Court determined that there was a genuine issue of material fact regarding whether S.C. Nestel intentionally submitted a false and misleading report, or whether S.C. Nestel's submission was merely an honest mistake. On March 29, 2010, the parties appeared with counsel for a Bench Trial on the parties' remaining claims.[1]

This Memorandum Opinion & Order is intended to serve as the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), after having examined the entire record and after having determined the credibility of the witnesses.

---

[1] S.C. Nestel's claim for unjust enrichment survived Wal-Mart's motion for summary judgment. However, during pretrial proceedings the parties informed the Court that, due to the Court's pretrial rulings, S.C. Nestel's claim for unjust enrichment was moot.

Any factual statement or finding more appropriately considered a conclusion of law shall be so deemed, and vice versa.  For the reasons discussed below, the Court finds that S.C. Nestel intentionally submitted a false and misleading report to deceive Wal-Mart.

## I.  FINDINGS OF FACT

### A.  WAL-MART'S SECOND CONSENT DECREE AND STORM WATER POLLUTION PREVENTION PLAN

In 2005, Wal-Mart was in the process of negotiating a Second Consent Decree with the United States Environmental Protection Agency (the "EPA".)  (Tr. at 211, 427.)  The EPA's principal concern was storm water contamination from Wal-Mart construction sites.  Upon an audit of Wal-Mart's actions under a First Consent Decree, the EPA concluded that Wal-Mart had failed to adequately supervise its general contractors to ensure the general contractors were in compliance with the applicable permit requirements.  (Tr. at 211-12.)  As a result, the EPA required Wal-Mart to put in place an oversight program with added checks and balances to ensure that the general contractors would comply with all federal, state, and local laws and regulations pertaining to Wal-Mart job sites.  (Tr. at 211-12, 436-37.)  The EPA and Wal-Mart finalized the Second Consent Decree in July 2005.  (Tr. at 427.)

In order to perform construction work, Wal-Mart must apply for a general permit from the EPA.  (Tr. at 442-43.)  As part of that coverage, Wal-Mart must implement a storm water pollution prevention plan ("SWPPP") on every job site over one acre.  (Tr. at 219, 443.)  The SWPPP is a complete plan to ensure that the job site meets the requirements of the permit.  (Tr. at 219-20.)  Pursuant to the SWPPP, each site utilizes  erosion control

3

mechanisms, commonly referred to by the parties as best management practices ("BMPs"), to control and eliminate pollutants from entering the waters of the United States.  (Tr. at 50, 443.)

As a result of the EPA's concern with sufficient checks and balances, the SWPPP contains multiple levels of oversight performed by three different "inspectors."  (Tr. at 220-22, 437-38.)  A job site superintendent performs daily inspections of all of the job site's BMPs on all working days Monday through Friday, excluding federal holidays.  (Tr. at 51, 220, 430.)  The superintendent performs daily inspections to ensure the BMPs are functional and not defective.  (Tr. at 220.)  The superintendent must complete an inspection report after each daily inspection.  (Ex. 2, § 8.N.1; Ex. 45 at S.C. 17009; Tr. at 51, 432.)  The general contractor's project manager performs the next level of oversight through bi-weekly inspections.  (Ex. 2, § 8.N.7; Tr. at 47, 220, 437.)  For the bi-weekly inspections, the project manager, sometimes referred to as the compliance officer, observes the project superintendent's daily inspection to ensure that the superintendent is performing the daily inspections correctly.  (Tr. at 60-62, 119, 220-21, 437.)  In addition, the project manager checks the superintendent's daily inspection forms from the previous fourteen days to verify that the forms meet the requirements of the applicable contract and general permit.  (Tr. at 61, 221, 223.)  Finally, the Wal-Mart Construction Manager in charge of the job site provides the final level over oversight through monthly inspections.  (Ex. 2, § 8.N.8; Tr. at 121-22, 438.)  Similar to the compliance officer's inspection, the Wal-Mart construction manager observes the superintendent's daily inspection and checks the inspection reports from the previous month.  (Tr. at 121-22, 221.)

Wal-Mart utilizes a standard form for its daily inspection reports.  (Ex. 2, §8.N.1; Ex. 45 at S.C.-17124-25.)  The form provides a space to identify the name of the inspector and the inspector's title, the date of the inspection, and the weather conditions.  (Ex. 45 at SC-17124.)  The form also contains a table.  (*Id.* at SC -17124-25.)  The first column identifies each BMP for the job site.  (*Id.*)  The second column provides a space to describe the status of the corresponding BMP from the first column, including any problems, maintenance needs, or non-conformance issues.  (*Id.*)  Finally, the third column provides a space to describe the date and corrective action taken to remedy any problems identified in the second column.  (*Id.*)  The table contains all of the findings for each inspection.  (*Id.*)  Immediately below the table, the form provides signature lines with a date and certificate number for the inspector, the compliance officer, and the Wal-Mart construction manager.  (*Id.* at SC-17125.)  Directly above each signature line is a certification statement, tailored to each person's role.  (*Id.*)  Above the daily inspector's signature, it states:

> I certify under penalty of perjury that I personally conducted this inspection and prepared this inspection report.  All corrective actions noted as necessary on preceding Daily Inspection Reports prepared by "Inspectors[,]" Compliance Officers, or Construction Managers have been fully completed as noted above in conformance with the time limitations provided in the Contract Documents.  Based upon my observations during the inspection, I certify that the information in this inspection report is true, accurate, and complete.  I am aware that there are significant penalties for perjury, including fines and imprisonment for knowing violations.

(*Id.*) The Compliance Officer's certification is identical to the Inspector's certification except for the first sentence, which states: "I certify under penalty of perjury that I personally observed this inspection." (*Id.*)  The Wal-Mart Construction Managers certification states:

> I certify under penalty of perjury that I personally observed this inspection. Based upon my observations during the inspection, I certify that the information in this inspection report is true, accurate, and complete.  In

5

addition, I have reviewed the _____ [insert number of inspection reports] inspection reports previous to this one and I certify that all corrective actions noted as necessary have been fully and timely completed.  I am aware that there are significant penalties for perjury, including fines and imprisonment for knowing violations.

(*Id.*)

As part of the SWPPP, the general contractor is required to maintain a three-ring binder (the "SWPPP binder") on the job site.  (Ex. 2, §§ 8.J.1; 8.N.5, Tr. at 51, 58, 265, 443.)  The SWPPP binder contains the daily inspection reports, the applicable permits, and other information.  (Tr. at 59.)  The SWPPP binder is the permanent record of the SWPPP for that job sites permit.  (Tr. at 221, 265.)  It must be maintained for a period of five years in case the EPA audits the job site.  (Tr. at 222.)  Placing a daily inspection report into the SWPPP binder constitutes an official submission to Wal-Mart.  (Tr. at 222.)

According to Shirley Morrow, who was Wal-Mart's Manager of Store Water Compliance in 2005, one of the basic requirements of the Second Consent Decree was the training and education of the general contractors' project managers and site superintendents and Wal-Mart's construction managers.  (Tr. at 225, 426-428.)  In anticipation of the SWPPP requirements, Morrow created and implemented Wal-Mart's storm water training certification program, which was approved by the EPA.  (Tr. at 427, 431.)  Wal-Mart requires all SWPPP inspectors, compliance officers, and Wal-Mart construction managers to attend an eight-hour course at Wal-Mart to become SWPPP certified. (Tr. at 51, 225, 427-28.)  The training culminated with an examination.  (Tr. at 53, 427-28.)  Morrow taught all of the training programs.  (Tr. at 427.)  She provided a training manual (the "SWPPP training manual") to the participants that contained the general construction permit, Wal-Mart's special conditions, a sample SWPPP, a sample SWPPP

6

binder, the PowerPoint slides Morrow used in her presentation, the Consent Decree, and other additional information.  (*See, e.g.*, Ex. 45; Tr. at 52, 54-55.)  The SWPPP training manual also provided contact information for Wal-Mart's SWPPP center.  (*Id.* at SC-17174; Tr. at 56.)

During the program, Morrow instructed the program participants on the federal construction general permit, the special conditions of the general contractors' contract with Wal-Mart, and the sample SWPPP.  (Tr. at 226, 431-32.)  In addition, Morrow taught an entire section on performing inspections, the inspection forms, and the different types of BMPs, including how to install, maintain, and inspect them.  (Tr. at 432.)  She also instructed the participants that they had to be on site to perform a compliance inspection. (Tr. at 441.)  Finally, Morrow reviewed the penalties for any SWPPP violations.  (Tr. at 433.)  In order to perform SWPPP inspections, one needs to complete a training certification program and pass an examination.  (Tr. at 430.)  The class is the same for daily inspectors, compliance officers, and Wal-Mart construction managers.  (Tr. at 55.)

## B.  S.C. NESTEL'S CONTRACT WITH WAL-MART

S.C. Nestel is a family-owned construction business that was started by Steve Nestel in 1984.  (Tr. at 107.)  It started with smaller projects, such as libraries and school projects, but eventually handled "big box projects," including constructing stores for Wal-Mart in 1991.  (Tr. at 107-08.)  From 1991 to 2005, S.C. Nestel managed approximately sixty projects for Wal-Mart as a general contractor.  (Tr. at 108.)

Charles Nestel ("Nestel"), Steve Nestel's son, is currently S.C. Nestel's President and one-hundred-percent owner of the company.  (Tr. at 39-40.)  He has held that position

7

since 2007.  (Tr. at 39.)  Prior to 2007, he never had an ownership interest.  (Tr. at 40, 44-45).  Rather, he worked as a project manager and eventually became general manager.  (*Id.*)  In 2005, Nestel was S.C. Nestel's General Manager, the second-highest ranking position in the company for field operations, and supervised approximately forty-six project managers.  (Tr. at 44-46.)  Nestel acted as the primary representative of S.C. Nestel with the owners for the projects Nestle managed.  (Tr. at 46, 229.)

Wal-Mart required S.C. Nestel to have two project superintendents for each of its projects.  (*Id.*)  One superintendent acted as lead superintendent for the job site.  (Tr. at 46, 247-48, 372.)  The lead superintendent managed the project on a day-to-day basis and interacted with Wal-Mart on behalf of S.C. Nestel.  (Tr. at 46-47.)  The other superintendent acted as that job site's SWPPP superintendent.  (Tr. at 46, 247-48.)  The SWPPP superintendent, while also responsible for site work, was the project's storm water officer charged with implementing the SWPPP, including performing the daily inspections every day they were required and faxing a signed copy to Wal-Mart.  (Tr. at 247-48, 252.)  S.C. Nestel also had a project manager for each site whose responsibilities included managing the superintendents and the project's schedule.  (Tr. at 47.)

In early 2005, Wal-Mart awarded S.C. Nestel a contract to construct a Wal-Mart store in Washington, Indiana (the "Washington project".)  (Exs. 1-2; Tr. at 47, 49.)  The parties agreement was comprised of both a general conditions contract (the "General Conditions") and a special conditions contract (the "Special Conditions") (collectively, the "Contract".)  (Exs. 1-2; Tr. at 194, 217.)  In addition, on March 24, 2005, Ohio Farmers issued to S.C. Nestel a performance bond and a payment bond for the Washington project.  (Ex. 125-26; Tr. at 48, 216-17.)

8

The Special Conditions provide additional instructions to S.C. Nestel for the Washington project.  (Tr. at 194, 217-18.)  Section 8 of the Special Conditions contains a somewhat lengthy section on storm water pollution prevention.  (Ex. 2, § 8.)  Among other things, it required daily inspections by a project superintendent, bi-weekly inspections by a project manager, and monthly inspections by a Wal-mart construction manager.  (*Id.*, § 8.N.1.,7., 8.)  It also required the daily inspector to complete a written report, which the inspector must keep on the job site.  (*Id.*, § 8.N.2., 5.)  Section 10(A) of the Special Conditions ("Section 10(A)") addresses false and misleading submissions of SWPPP documentation, including daily inspection reports.  (Ex. 2, § 10, Tr. at 196.)  It stated:

> Several letters of certification and other submittals and documentation are required to be provided by [S.C. Nestel] pursuant to the Contract Documents. If any of those letters of certification, submittals or other documentation are false or misleading, [Wal-Mart] shall have the right to terminate the Contract immediately for cause in its sole discretion and shall have all rights and remedies available to it at law, in equity or under the Contract Documents, including, without limitation, Section 8.S.3.b. of these Special Conditions.

(Ex. 2, § 10(A).)

S.C. Nestel began working on the Washington project immediately.  (Tr. at 49.) From March 24, 2005, until S.C. Nestel hired Crag Alaban ("Alaban"), Nestel served as interim project manager.  (Tr. at 49.)  The first official project manager was Alaban, whom S.C. Nestel hired in approximately May 2005.  (*Id.*)  S.C. Nestel terminated Alaban's employment in early September 2005 due to poor performance.  (*Id.*)  As a result, Nestel re-assumed the role of acting project manager for the Washington project, including on September 8, 2005.  (Tr. at 49-50.)  During this time, Nestel's office was located in Indianapolis, Indiana, which according to Nestel is about a three-hour drive from the Washington project.  (Tr. at 50.)  S.C. Nestel hired Ricky Dean Adams ("Adams") as lead

9

superintendent and Greg Blair ("Blair") as the SWPPP superintendent.  (Tr. at 53, 120, 245, 374.)  Nestel, Adams, and Blair participated in Wal-Mart's SWPPP training and passed the examination.  (Tr. at 52, 249-50, 374.)  Nestel understood the requirements of Wal-Mart's SWPPP program after his certification training.  (Tr. at 56.)  He got the impression that Wal-Mart took the SWPPP program seriously.  (Tr. at 58.)

### C.  EVENTS LEADING UP TO WAL-MART'S TERMINATION OF THE CONTRACT

On Thursday, September 8, 2005, Nestel visited the Washington project job site to check on a lime issue that had arisen on the site.  (Tr. at 62, 391.)  During his visit, Adams took Nestel on a tour of the job site, during which they rode by most of the BMPs.  (Tr. at 128-29, 267, 392.)  Nestel never told Adams that he was performing a compliance officer inspection on their ride.  (Tr. at 391-92.)  Before Adams and Nestel left on their tour, Nestel instructed Blair to take S.C. Nestel's recently hired project manager, Brad Spurgin, on a daily SWPPP inspection.  (Tr. at 129, 268, 322.)  Nestel wanted Blair to show Spurgin how to properly perform a daily inspection.  (Tr. at 183.)  At that point, Blair had performed daily inspections of the Washington project job site for a month and was familiar with the BMPs.  (Tr. at 201-02.)  Blair and Spurgin toured the job site and performed a SWPPP inspection.  (Ex. 34; Tr. at 267.)  Blair completed a Daily Inspection Report after his inspection, which he signed as the Daily Inspector.  (Ex. 34.)

Nestel did not observe Blair perform his daily SWPPP inspection on September 8, 2005.  (Tr. at 62, 74, 129, 322.)  During his tour with Adams, Nestel rode by some but not all of the BMPs.  (Tr. at 391-92.)  In addition, Nestel did not check the SWPPP notebook, the entrance postings, or the site map.  (Tr. at 62, 72-73.)  Nestel did not discuss Blair's

findings with Blair, nor did he review Blair's Daily Inspection Report with Blair.  (Tr. at 74, 137-38, 327-28, 408.)  Likewise, Nestel did not sign Blair's Daily Inspection Report as the Compliance Officer.  (Ex. 34 at SC-17578; Tr. at 62, 74.)  Nestel did not complete a compliance officer inspection on September 8, 2005.  (Ex. 2, § 8.N.7; Tr. at 74, 391.)

S.C. Nestel documents its daily construction activities through the use of daily construction reports.  (Tr. at 135, 248, 319.)  The purpose of the report is to record the weather and the events that occurred each day, and to identify which subcontractors were present on the job site.  (Ex. 3; Tr. at 323-24.)  It was generally the job site superintendents' responsibility to complete the daily construction reports.  (Tr. at 323-24.)  Adams completed the daily construction report for September 8, 2005 (the "Construction Report").  (Ex. 3; Tr. at 391-92.)  Under "Activities," the Construction Report states:  "Chuck Nestel came on site to go over lime area issues.  Took him [on] a ride and showed him the area.  Brad Spurgeon (sic) P.M., Rick Adams [and] Greg Blair.  Whent (sic) over site problems."  (Ex. 3.)

On Monday, September 12, 2005, Blair performed a daily inspection and completed a Daily Inspection Report.  (Ex. 209, Tr. at 257.)  While he filled out the report, he realized that there had not been a bi-weekly compliance inspection and thought that September 12, 2005, was the deadline for Nestel to perform a compliance inspection.  (Tr. at 257.)  Blair was used to Alaban keeping track of the bi-weekly compliance inspection deadlines, but S.C. Nestel had terminated Alaban's employment and no one from S.C. Nestel maintained his inspection calendar.  (Tr. at 92-93, 119, 328.)  Blair thought that Nestel needed to perform a compliance inspection that day to avoid a fine under the Special Conditions.  (Tr. at 257-58.)  As a result, Blair telephoned Nestel at Nestel's Indianapolis office.  (Tr. at 75,

11

330.)  On that particular day, Nestel was busy with his day-to-day duties, including sales and supervising project managers.  (Tr. at 75.)  S.C. Nestel had an "enormous" workload in 2005.  (Tr. at 92.)  In addition, S.C. Nestel was transitioning project manager duties from Alaban to Spurgin and, consequently, Nestel had additional responsibilities for the Washington project.  (Tr. at 92-93.)

During their conversation, Blair informed Nestel that September 12, 2005, was the last day to complete a compliance inspection and asked Nestel if he intended to come to job site to sign the report.  (Tr. at 76, 258, 330.)  Nestel told Blair that he did not have time to come to the job site to sign the report.  (Tr. at 258.)  Blair responded that Nestel needed to come down to the job site to sign the September 12 Report in person, and that there would be a one thousand dollar fine if they were late with the compliance report.  (Tr. at 258, 274-75.)  Nestel reviewed Blair's findings for his September 12, 2005, inspection with Blair over the phone and specifically asked if there were any changes in the condition of the job site since September 8, 2005.  (Tr. at 76, 260-61.)

Nestel told Blair to fax Blair's September 12 Report to Nestel's office in Indianapolis so Nestel could sign it and fax it back to the job site.  (Tr. at 76, 258, 377-78.)  After receiving the fax, Nestel signed the September 12 Report on the Compliance Officer signature line and dated it September 12, 2005.  (Ex. 6; Tr. at 76, 148.)  Nestel had read the certification statement prior to that day.  (Tr. at 79.)   Nestel gave the signed report to his secretary and instructed her to fax it back to the Washington project job site.  (Tr. at 76, 148.)  Nestel intended the report to be placed in the SWPPP binder.  (Tr. at 84, 148.)  In addition, he intended that Adams or Blair would fax the September 12 Report to Wal-Mart.  (Tr. at 195-96.)  Nestel knew that if he did not prepare or sign the report on September 12,

12

2005, S.C. Nestel would be subject to a one thousand dollar fine.  (Tr. at 163.)  In addition, Nestel never told Blair that by signing the September 12 Report, Nestel was signing for an inspection performed on September 8, 2005.  (Tr. at 261.)

Blair thought that the September 12 Report was "falsified" and knew placing the signed report in the SWPPP binder was "wrong."  (Tr. at 262, 271-72.)  Nevertheless, Blair placed the faxed report with Nestel's signature in the SWPPP binder.  (Tr. at 261-62.)  Blair thought that he, Adams, and Nestel would have ample time to discuss what to do with the faxed report before Wal-Mart's next monthly inspection.  (Tr. at 263.)  Blair thought that they might decide to destroy the report and pay the fine, or just replace it to "trick[] Wal-Mart."  (Tr. at 263-64.)  In addition, Blair thought there was a chance Al Norton, Wal-Mart's Construction Manager responsible for the Washington project, would miss the faxed report during his inspection.  (Tr. at 277-78, 349.)  Ultimately, the report stayed in the SWPPP binder.  (Tr. at 264.)

On September 21, 2005, Norton, Nestel, Adams, and Blair had a meeting scheduled for one o'clock in the afternoon at the Washington project job site.  (Tr. at 84-85.)  Prior to Nestel's arrival to the job site, Norton performed his monthly inspection of the Washington project.  (Ex. 7; Tr. at 384-85, 458, 501-02.)  During his review of the SWPPP binder, Norton noticed that the September 12 Report had been faxed from S.C. Nestel's office back to the job site trailer.  (Tr. at 385, 511, 542-43.)  He asked Adams why there was a faxed document in the SWPPP binder.  (Tr. at 385, 513.)  Adams told Norton that Nestel forgot to sign a compliance officer report, signed the September 12, 2005, report, and faxed it back to the trailer.  (Tr. at 385, 512.)  A short time later, Blair entered the job site trailer, and Norton asked Blair why there was a faxed report in the SWPPP binder.  (Tr. at 278.)

13

Although Blair initially refused to answer, Blair eventually told Norton that Nestel was not on the job site on September 12, 2005.  (Tr. at 278-80.)  Blair told Norton that he faxed the report to Nestel on that day, that Nestel faxed it back, and that Blair placed it in the SWPPP binder.  (*Id.*)  Nestel eventually arrived at the job site.  (Tr. at 84-85, 387, 513-14.)  Norton asked Nestel about the faxed report, and Nestel told Norton that Nestel did not have time to drive to the job site and did not think it was necessary to drive three hours to complete the report when he was there just days before and all the BMPs were compliant.  (Tr. at 387, 514.)

Norton called Morrow and Norton's superior, Dave Oshinski ("Oshinski"), who was then Wal-Mart's Director of Construction for the region covering Washington, Indiana, to inform them that Nestel had signed and faxed a daily inspection report on a day he had not been to the job site.  (Tr. at 438-39, 513, 515.)  Oshinski told Norton to hold off on making any decisions until the situation was discussed with the Storm Water Group.  (Tr. at 513.)  Either Oshinski or Norton called Bryan Novak ("Novak"), then Senior Director of New Store Construction for Wal-Mart, and informed Novak that Nestel faxed a report from his office to the job site without actually being on the job site to perform the biweekly inspection.  (Tr. at 209, 231-32.)

On September 22, 2005, Novak suspended S.C. Nestel's work on the Washington project until further notice to allow Wal-Mart time to investigate.  (Ex. 10; Tr. at 88, 159-60, 231-32, 288-90.)  Wal-Mart put together a team to investigate the faxed report.  (Tr. at 238.)  The team members included Novak; Rob Bray, Senior Vice President of Wal-Mart Realty; Morrow and Tom Oppenheim, part of Wal-Mart's SWPPP compliance team; and Jennifer May-Brust and Karen Roberts from Wal-Mart's legal department.  (Tr. at 238.)  On

14

September 23, 2005, Nestel emailed Al Norton and several other members of the investigative team.  (Ex. 11.)  Nestel explained that his "transgression" was the result of "time and resource constraints," and he assured Norton that Nestel had visited the Washington project job site the week before and confirmed the job site's conditions on September 12 before signing the report.  (*Id.*)

In response, the investigation team invited Nestel to Bentonville, Arkansas, for a meeting on September 27, 2005.  (Ex. 12; Tr. at 93, 161.)  On September 27, 2005, Nestel met with several Wal-Mart representatives, including Norton, Oppenheim, Novak, and Bray.  (Tr. at 94.)  Nestel gave a prepared presentation regarding S.C. Nestel's dedication to SWPPP moving forward.  (Ex. 13; Tr. at 96.)  Nestel was told that S.C. Nestel needed to change its organizational structure, and that Nestel needed to come back in two weeks with a plan.  (Tr. at 96-97, 165-66, 518.)

In the interim, both Morrow and Novak recommended that Wal-Mart terminate the Contract.  (Tr. at 238, 446.)  Morrow and Novak concluded that Nestel knowingly submitted a falsified report under Section 10(A) because he signed and faxed a bi-weekly compliance inspection report when he had not actually been on site to perform an inspection.  (Tr. at 233-34, 236, 238, 446, 596.)

On September 30, 2005, Novak called Nestel to inform him that Wal-Mart was terminating the Contract for the Washington project.  (Tr. at 102.)  Eric Zorn, Executive Vice President of Wal-Mart Realty, made the final decision to terminate the Contract.  On October 12, 2005, Novak mailed S.C. Nestel and Ohio Farmers a formal termination letter, which explained that S.C. Nestel had failed to comply with the requirements of Section 8 of the Special Conditions.  (Ex. 24 at WM(NES)001386; Tr. at 104, 171.)

15

## II. <u>CONCLUSIONS OF LAW</u>

Article 23.9 of the General Conditions provides that the Contract "shall be construed, governed, and enforced under the laws of the State in which the Project is located, without regard to the internal law of such State regarding conflicts of law."  Ex. 1, Art. 23.9. Accordingly, the laws of Indiana apply to this contract action.

"Under Indiana law, the elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *U.S. Valves, Inc. v. Dray*, 190 F.3d 811, 814 (7th Cir. 1999) (citing *Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind. Ct. App. 1993)); *see also Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009) (citing *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000)).  It is the complaining parties' burden to prove each of these elements by a preponderance of the evidence.

Here, neither Wal-Mart nor S.C. Nestel[2] dispute the existence of a valid and enforceable agreement.  In addition, the parties have stipulated to the existence and amount of damages.  Dkt. No. 129, Joint Stip. of Fact Nos. 1 and 2.  The main dispute between the parties is whether Wal-Mart wrongfully terminated the Contract under Section 10(A).

Under Section 10(A) of the Special Conditions, Wal-Mart had the right to terminate the Contract immediately for cause in its sole discretion if S.C. Nestel intentionally

---

[2] The parties agree that if Wal-Mart succeeds on its breach of contract claim against S.C. Nestel, then it automatically succeeds on its claim against Ohio Farmers. Therefore, the Court refers only to S.C. Nestel.

16

submitted a false and misleading report.  (Ex. 2, § 10(A); Dkt. No. 66 at 16-17.[3])  Initially, the Court notes that the September 12 Report qualifies as an official submittal covered by Section 10(A).  (Ex. 3, § 10(A).)  Section 8.N.2 requires the project superintendent performing the daily inspection to record the results of the inspection on a Daily Inspection Report form and certify the information contained in the report by signing the "Inspector's" signature block.  (Ex. 2, § 8.N.2.)  In addition, the superintendent is required to fax the Daily Inspection Report to Wal-Mart and also place the report in the job site's SWPPP binder.  (*Id.*)  The SWPPP binder is the official record of the SWPPP for each job site, and a submission to the binder constitutes a submission to Wal-Mart.  (Tr. at 221-22, 265.)  Therefore, the Daily Inspection Reports are "submittals and documentation . . . required to be provided by [S.C. Nestel] pursuant to the Contract Documents.  (Ex. 2, § 10(A); Tr. at 59, 221-22, 265.)

Accordingly, the critical determination is whether S.C. Nestel intentionally submitted a false and misleading report under Section 10(A) by placing the September 12 Report in the SWPPP binder.  If S.C. Nestel did, then Wal-Mart acted consistently with its rights under Section 10(A).  However, if S.C. Nestel did not intentionally submit a false and misleading document, then Wal-Mart wrongfully terminated the Contract.

Wal-Mart asserts that S.C. Nestel, through Nestel, Blair and Adams, submitted a false and misleading report when Blair placed the September 12 Report into the SWPPP binder at the Washington project job site.  Wal-Mart argues that Nestel, Blair, and Adams

---

[3] During closing arguments, Wal-Mart objected to the Court's earlier decision that Wal-Mart was required to demonstrate that S.C. Nestel intentionally submitted a false and misleading report.  (Tr. at 692-63.)  The Court overruled Wal-Mart's objection on the record.  (Tr. at 693.)

all thought that S.C. Nestel would miss its bi-weekly compliance inspection deadline if they did not submit a report on September 12, 2005, and that they submitted the report to avoid a one thousand dollar fine.  In addition, Wal-Mart argues that the report is false and misleading because Nestel did not actually perform a compliance level inspection on September 12, 2005.  Therefore, Wal-Mart asserts that it has established by a preponderance of the evidence that S.C. Nestel intentionally submitted the September 12 Report to deceive Wal-Mart so that S.C. Nestel would avoid a fine.

Conversely, S.C. Nestel asserts that while the contents of the September 12 report were not entirely accurate, Nestel did not have the requisite intent to deceive Wal-Mart. Rather, S.C. Nestel asserts that Nestel merely signed the September 12 Report with the intent that he was signing for the inspection he "substantially" performed in September 8, 2005.  Additionally, S.C. Nestel claims that, because the September 12 Report had fax lines, making it noticeable to any reasonable viewer that it was not an original copy, no reasonable person could conclude Nestel intended to deceive Wal-Mart.  S.C. Nestel also notes that Nestel never denied signing the September 12 Report from his office in Indianapolis.  According to S.C. Nestel, this fact demonstrates Nestel's lack of improper intent to deceive Wal-Mart.

The Court concludes that Wal-Mart has proven by a preponderance of the evidence that S.C. Nestel, through Nestel and Blair, breached the Contract under Section 10(A). First, the Court concludes that the September 12 document is false and misleading.  Nestel did not perform a compliance inspection on September 12, yet by signing the report, he attested subject to the penalties of perjury that he personally observed Blair's inspection on September 12, 2005, and that all corrective actions had been performed on the BMPs.

18

(Ex. 6.)  The SWPPP requires the compliance officer to actually visit the site and personally observe the superintendent's daily inspection.  (Ex. 2, § 8.N.7.)  Consistent with the EPA's concern for adequate oversight, the compliance inspection ensures that the SWPPP superintendent correctly inspects and monitors the job sites's BMPs.  The September Report is both false–it incorrectly reports that Nestel performed an inspection on September 12, 2005–and misleading–anyone who reads the report would automatically believe Nestel was on the job site that day.

Second, Nestel and Blair intentionally submitted the false and misleading September 12 Report to deceive Wal-Mart.  Nestel and Blair both took Wal-Mart's SWPPP training course and passed the examination.  (Tr. at 52, 248-50, 374.)  Therefore, Morrow instructed them on Wal-Mart's SWPPP program, including an entire section on performing inspections, completing inspection reports, and the different types of BMPs.  (Tr. at 432.)  Moreover, Nestel and Blair knew that Nestel had to be on site to personally observe Blain in order to perform an official compliance inspection.  (Tr. at 60-61, 271-72.)  Finally, during the SWPPP training Blair and Nestel learned that Wal-Mart would fine S.C. Nestel for violations of the SWPPP.  (Tr. at 116-17, 264, 273-74.)  Nestel and Blair were therefore familiar with the SWPPP, including penalties for violations, when Blair called Nestel the morning of September 12, 2005.

While completing his Daily Inspection Report for September 12, 2005, Blair realized, or so he thought, that September 12, 2005, was the last day for S.C. Nestel to submit a compliance officer inspection report to avoid a fine.  Blair lost track of the deadline because he was used to Alaban monitoring S.C. Nestel's reporting deadlines.  Blair called Nestel at his Indianapolis office to inform him that he needed to complete a compliance officer

19

inspection that day to avoid a fine.  When Nestel told Blair he did not have time to drive down to the job site, Blair specifically instructed Nestel that he needed to be on site to complete his compliance level inspection.   Nevertheless, Nestel told Blair to fax the unsigned report to Nestel's office so Nestel could sign it and fax it back to the job site. Nestel specifically asked whether the conditions had changed since his September 8, 2005, visit to the job site.  Nestel signed the September 12 Report, knowing full well that he signed it subject to penalties of perjury, and intended that Blair or Adams would place the report in the SWPPP binder, thereby officially submitting the report to Wal-Mart.  Upon receipt of the September 12 Report, Blair placed it in the SWPPP binder, even though he knew it was wrong, because Blair thought that he or Adams might destroy the report or replace it with an original to trick Wal-Mart.  Blair also thought there was a chance that Norton would not discover the September 12 Report in the SWPPP binder.  Wal-Mart has established these facts by a preponderance of the evidence.  Based upon these facts, the Court concludes that Nestel and Blair submitted the September 12 Report to Wal-Mart with the intent to deceive Wal-Mart into thinking Nestel performed a compliance officer inspection on September 12, 2005, when in fact he did not, so that S.C. Nestel would avoid a fine under the Contract.

S.C. Nestel's view of the facts is not supported by credible evidence in the record. Nestel claims that when he signed the September 12 Report, he intended to sign for the inspection he performed on September 8, 2005.  First, the Court credits the testimony of Adams that Nestel did not perform an inspection.  Rather, Nestel was on site to review lime issues that had arisen with a subcontractor.  S.C. Nestel's construction report from September 8, 2005, the purpose of which is to record the events that took place on the job

site that day, is consistent with Adam's testimony.  According to the report, which Adam's prepared, "Nestel came on site to go over lime area issues.  [I] took him on a ride and showed him the area." (Ex. 3.)  Notably, the report does not say that Nestel performed a compliance level inspection–even though Nestel toured the facility with only Adams, the Construction Report's author–and Nestel offers no explanation about this omission.

However, even if the Court did not credit Adam's testimony, Nestel could not have thought he was certifying an earlier inspection by signing the September 12 Report because Nestel's own testimony reveals he did not actually perform a compliance officer inspection on September 8, 2005.  Nestel did not inspect all of the BMPs and did not review the SWPPP notebook.  More importantly, Nestel did not observe Blair perform his daily SWPPP inspection in order to ensure Blair's inspection was consistent with the requirement of the SWPPP.  Likewise, Nestel never compared his findings with Blair, never asked Blair to see the inspection report, and never told Blair that Nestel was performing a compliance officer inspection.  Moreover, Nestel's testimony that he thought he had "substantially complied" with the SWPPP requirements is not credible.  Nestel participated in Wal-Mart's SWPPP training with Morrow and scored perfectly on the examination.  In addition, he was familiar with the SWPPP prior to the Washington project and knew that Wal-Mart took the program seriously.  His claim that he completed a SWPPP inspection by merely "substantially complying" with the SWPPP's requirements is not consistent with his other testimony that he takes the SWPPP seriously.  Therefore, because there is no credible evidence that Nestel performed–or that Nestel thought he performed–a compliance officer inspection on September 8, 2005, it strains credibility to believe Nestel's testimony that he was certifying a prior inspection when he signed the September 12 Report.  Moreover, even

21

assuming Nestel actually performed an official compliance officer inspection on September 8, 2005, his testimony that his September 12, 2005, signature was merely certifying his September 8 inspection is still not credible.  During his phone conversation with Blair on the morning of September 12, Nestel specifically asked Blair whether the conditions of the BMPs on September 12 were different than the conditions on September 8.  If, as Nestel contends, he was merely signing off for his September 8, 2005, inspection, there would have been absolutely no need to ask Blair whether the conditions had changed.

Finally, Nestel contends that the fax lines on the September 12 Report would have been so noticeable that no reasonable person would try to deceive Wal-Mart by using a faxed signature.  Although placing a faxed report in a binder of original materials may not have been the best way to deceive Wal-Mart, Nestel cannot overcome the overwhelming credible evidence that he and Blair intentionally submitted a false and misleading report to Wal-Mart.  If anything, Nestel's decision to fax the falsified documents instead of using some other means of delivery is consistent with the circumstances in which Nestel found himself on the morning of September 12: overwhelmed with his "enormous" workload and faced with a decision to spend his day driving to Washington, Indiana, or to fax the report and hope Wal-Mart would never discovery his "transgression."  Nestel chose the latter, Wal-Mart discovered the falsified document, and S.C. Nestel must face the consequences.

In conclusion, Wal-Mart acted within it contractual rights when it terminated the Contract because S.C. Nestel intentionally submitted a false and misleading daily inspection report.  Wal-Mart is therefore entitled to judgment in its favor and against S.C. Nestel and Ohio Farmers in the amount of $3,176,662.11, plus prejudgment interest at a

rate of eight percent (8%) per annum from October 1, 2007.  (Dkt. No. 129, Joint. Stip. Fact No. 3.)

### III.  <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Wal-Mart has proven by a preponderance of the evidence that the parties had a valid and enforceable agreement, that S.C. Nestel breached that agreement, and that as a result of S.C. Nestel's breach Wal-Mart suffered damages in the amount of $3,176,662.11 plus prejudgment interest. Accordingly, Wal-Mart is entitled to judgment in its favor and against S.C. Nestel on Wal-Mart's breach of contract claim.  Likewise, Wal-Mart is entitled to judgment in its favor and against Ohio Farmers on Wal-Mart's claim for failure to defend and indemnify.  Conversely, the Court concludes that S.C. Nestel has failed to prove by a preponderance of the evidence that Wal-Mart breached the parties agreement.  Therefore, Wal-Mart is entitled to judgment in its favor and against S.C. Nestel on S.C. Nestel's breach of contract claim. The Court shall enter judgment accordingly.

IT IS SO ORDERED this 2nd day of June, 2010.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Distribution attached.

23

Distribution to:

Raymond A. Basile
MERCER BELANGER, P.C.
rbasile@indylegal.com

Mark J. Dinsmore
BARNES & THORNBURG LLP
mark.dinsmore@btlaw.com

Jimmie Lamar McMillian
BARNES & THORNBURG LLP
jmcmillian@btlaw.com

David J. Theising
HARRISON & MOBERLY
dtheising@h-mlaw.com